U.S. District Court
District of Connecticut
FILED AT NEW HAVEN

9/19 ,20 22

By     N. Langello
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INORMATION ASSOCIATED WITH CELLULAR TOWERS | Case No.   3:22-mj-857 RMS **Filed Under Seal** |

## AFFIDAVIT

I, Nathaniel May, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), having been duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.     I make this affidavit in support of applications for search warrants for records and information associated with certain cellular towers (cell towers) that are in the possession, custody, and/or control of AT&T Wireless Inc., a cellular service provider headquartered in Dallas Texas; Verizon Wireless, a cellular service provider headquartered in New York, New York; and T-Mobile, headquartered in Bellevue, Washington (collectively, the "Service Providers")[1].

2.     The towers relevant to the requested search warrant are further described in Attachment A and are referred to herein as the "Target Towers."

---

[1] In *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the Supreme Court held that the acquisition of historical cell-site location information for seven days or more for a particular cell phone constitutes a Fourth Amendment search and thus requires a warrant. The Supreme Court, however, expressly declined to rule on the question of whether the acquisition of tower dump information would constitute a Fourth Amendment search. *Id.* at 2220. Furthermore, tower dump information is qualitatively different from historical cell-site location information for a particular cell phone in ways that provide arguments that the acquisition of tower dump information is not a Fourth Amendment search. While the Government maintains that the continued use of 2703(d) orders to obtain tower dump information is permissible and that a search warrant is not required, it nonetheless seeks the requested search warrants in this matter based on the establishment of probable cause to support the requested warrants as discussed below.

**Page 1 of 21**

3.      The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require the Service Providers to disclose to the government copies of the information further described in Section I of Attachment B.

4.      Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

5.      The search warrants will assist law enforcement with an investigation concerning a Hobbs Act Robbery in violation of Title 18 U.S.C. § 1951, use of a firearm in furtherance of a crime of violence in violation of Title 18 U.S.C. § 924(c), as well as other firearm offenses that occurred in the District of Connecticut on three dates starting on or about August 14, 2022, culminating with the Hobbs Act Robbery on August 23, 2022.

6.      Law enforcement has yet to identify suspects involved in the commission of the above listed offenses. By identifying cellular devices that were present in the vicinity of the crimes at or near the times of the crimes, the requested search warrant would help law enforcement to identify and apprehend the robbery suspect(s) and/or identify potential witnesses.

7.      I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other agents of the ATF and other members of law enforcement; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another ATF agent, law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and

reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

8.      This affidavit sets forth facts and evidence that are relevant to the requested warrants, but it does not set forth all of the facts and evidence that I have gathered during the course of the investigation of this matter. I have set forth only those specific and articulable facts that establish reasonable grounds to believe that the requested information is relevant and material to an ongoing criminal investigation pursuant to 18 U.S.C. § 2703(d) and that establish probable cause to believe that the requested information will lead to evidence of a crime sufficient for the issuance of a search warrant pursuant to Fed. R. Crim. P. 41 and 18 U.S.C. § 2703(c )(1)(A).

**AFFIANT TRAINING AND EXPERIENCE**

9.      I am a Special Agent with ATF. Prior to my employment with ATF, I worked as a licensed professional fire protection engineer for West Coast Code Consultants, Inc. for two years. I graduated from the University of Maryland in December 2015 with my Bachelor of Science Degree and May 2017 with my Master of Science Degree, both in Fire Protection Engineering.

10.     I have been employed by ATF as a Special Agent since June 2021. I have completed the Criminal Investigator Training Program (CITP) and the ATF Special Agent Basic Training program (SABT), both of which are conducted at the Federal Law Enforcement Training Center (FLETC) in Glynn County, Georgia. I have received specialized training in firearms identification and the investigation of firearms-related offenses. As a result of my training and experience as an ATF Agent, I am familiar with federal firearm and ammunition laws. I have participated in investigations involving the unlawful possession of firearms by

prohibited persons, including persons who are previously convicted felons; the possession of firearms in furtherance of the distribution of drugs and crimes of violence; and the use of firearms in the commission of violent acts. I have received training, both formal and on-the-job, in the provisions of the federal firearms and drug laws administered under Titles 18, 21 and 26 of the United States Code.

11.     Based on my training, personal experience, participation in said criminal investigations, and the collective experience of other law enforcement officers that I work with, I have become familiar with the methods and techniques used by individuals engaged in criminal use of firearms.

12.     As an ATF SA, I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code; that is, an officer empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Section 2516 of Title 18.

## PROBABLE CAUSE

### A. Overview

13.     The Waterbury Police Department (WPD) and the ATF are currently investigating the armed robbery of an individual (identified hereinafter as "Victim-1") that operates a private Automated Teller Machine (ATM) business as well as two shoots-fired complaints that are believed to be related.

14.     On August 23, 2022, while refilling an ATM located in Waterbury, Connecticut, Victim-1 was robbed at gunpoint. During a physical struggle between the currently unknown assailant (identified hereinafter as "UM1") and Victim-1, a firearm possessed by UM1 was discharged, though no one was known to have been struck.  UM1 fled the area with

approximately $35,000 in cash taken from Victim-1. The firearm that was discharged during the robbery was left behind by UM1 and ultimately recovered by WPD officers.

15.     As discussed below, the recovered firearm, a Smith & Wesson M&P Shield bearing serial number JMV5206, was later test fired by WPD, with the spent cartridge casing being entered into the National Integrated Ballistic Information Network (NIBIN)[2] for comparison to cartridge casings recovered from other shooting incidents.  Preliminary analysis ultimately linked the recovered firearm through NIBIN to two (2) other shootings in Waterbury, Connecticut, which occurred on August 14, 2022, and August 15, 2022, both which are detailed below. Not only were the shootings on August 14 and 15, 2022 linked via recovered spent cartridge casings, but the same vehicle, a white Toyota Corolla, was believed to have been involved in both shoots-fired incidents.

**B.  NIBIN Connected Event #1: August 14, 2022**

16.     On August 14, 2022, at approximately 19:58 EST, WPD officers responded to the area of N Main Street and E Farm Street in Waterbury, Connecticut in response to a report of a drive-by shooting. The complainant stated a white Toyota Corolla bearing Connecticut registration AX92214, driven by a Hispanic male with a black passenger, shot at a black vehicle. Arriving WPD officers located one (1) 9mm spent cartridge casing on E Farm Street at the intersection of N Main Street. A different witness stated that a white vehicle, with two occupants, shot two or three times at a blue vehicle. Both vehicles fled south on N Main Street.

---

[2] NIBIN analysis uses collected ballistics evidence, specifically spent cartridge casings found at the scenes of shootings, and then analyzes the cases for commonality against other casings that have been collected from other shooting scenes.  NIBIN analyzes the firing pin impressions, ejector marks and other unique marks on the breach face of the casings in order to link ballistic evidence. These marks are unique to specific firearms and are similar to the way that fingerprints are unique to individual people. The same way that no two people have the same fingerprints, no two firearms will leave the same exact marks on a casing.

17.      WPD viewed surveillance camera footage from the business located at 807 N Main Street. Officers observed in the footage a black vehicle, possibly a Volvo, sitting in a line of traffic on E Farm Street at approximately 19:35 EST that same day. The black vehicle went around the other vehicles in traffic, with a male observed shooting out the passenger-side window. The black vehicle then turned south onto N Main Street, followed by a white vehicle, possibly a Toyota. The passenger appeared to be white or Hispanic with a gray shirt and black face mask.

18.      The registration observed on the white Toyota Corolla returned to a silver Honda Civic. The recovered spent cartridge casing was subsequently entered into NIBIN by WPD.

**C.  NIBIN Connected Event #2: August 15, 2022**

19.      On August 15, 2022, at approximately 11:56 EST, WPD officers responded to the area of a particular address[3] on Willow Street in Waterbury, Connecticut, in response to a report of shots fired. The complainant stated to officers that he/she observed an individual wearing a matching all-black jumpsuit with silver striping on the sleeves and legs running west on Grove Street, near the entrance to the rear driveway of the particular location on Willow Street. The individual was observed firing a "handgun" towards the north side of Grove Street. The complainant stated he/she heard approximately six (6) shots fired and observed shell casings in the roadway of Grove Street. WPD officers recovered five (5) silver 9mm spent cartridge casings near the rear driveway entrance, as indicated by the complainant.

---

[3] Each reference to a "particular address" on a specific street as discussed in this affidavit is know to the undersigned affiant.

20.     An additional witness, "Witness-2", reported to WPD via telephone that he/she had heard approximately five (5) shots fired from the area of Central Avenue and Hillside Avenue (two streets northeast of Willow Street).

21.     An anonymous witness, "Witness-3," contacted police stating that he/she had observed two vehicles traveling north on Central Avenue shooting at each other. Witness-3 stated one of the vehicles appeared to be a silver Honda Civic with an out-of-state registration and the other was a white Toyota Camry with a Connecticut registration. Witness 3 stated the vehicle(s) turned right onto Central Avenue and then onto Hillside Avenue. WPD responded to the area of Hillside Avenue, recovering three (3) spent cartridge casings from the south side of Hillside Avenue.

22.     At approximately 12:04 EST, WPD officers spotted a white Toyota Corolla in the area of Greenwood Avenue and Cooke Street in Waterbury, CT. The white Toyota Corolla was seen pulling into the driveway of a particular address on Cooke Street, with the two (2) occupants exiting and talking to the resident(s) of the address. The driver was described as a stocky Hispanic male, approximately in his 20s, wearing red shorts with his hair in a bun. The passenger was described as a black male, approximately 6'1," with a thin build, dressed in all black clothing with his hair in a bun. The registration observed on the white Toyota Corolla, AX92214, returned to a silver Honda Civic. The vehicle left the particular address on Cooke Street and soon after fled from WPD when emergency lights and sirens were activated in an attempt to conduct a vehicle stop. The vehicle was last seen in the vicinity of the Truman Apartments off N. Main Street in Waterbury, Connecticut.

23.     Witness-2 later contacted WPD to report that the plastic fencing located at a particular address on Prospect Street had a bullet hole in it. A responding WPD officer observed

three (3) holes in the fencing at the particular address on Prospect Street, however, one (1) of the holes did not appear to be from a bullet.

24.     The recovered spent cartridge casings, eight (8) in total from the two different locations, were subsequently entered into NIBIN by WPD.

25.     It should be noted that a WPD officer reviewed surveillance camera footage in the area of the particular address on Willow Street where WPD officers initially responded.  At approximately 11:50 EST, a white Toyota Corolla was seen turning onto Willow Street from Johnson Street and then proceeded to stop at the intersection of Grove Street.  Seconds later, a small silver sedan was observed traveling on Grove Street, perform a U-turn in the intersection of Willow Street, and head back east on Grove Street.  Seconds later, a skinny male of average height was observed running west on Grove Street, crossing over Willow Street.  The male on foot was last seen heading west on W. Main Street toward Sperry Street.

26.     The WPD officer viewing the surveillance footage was not able to note the registration of the white Toyota Corolla observed on camera footage at in the area of Willow Street.  However, unique features of the vehicle (5-spoke wheels, rear spoiler, body kit, broken hanging rear-center brake light, black circular sticker on rear bumper) appeared to be consistent with the white Toyota Corolla later seen bearing Connecticut registration AX92214 on Cooke Street.

**D.  NIBIN Connected Event #3: Armed Robbery on August 23, 2022**

27.     On August 23, 2022, at approximately 15:24 EST, a WPD officer was waved down by the complainant (Victim-1), in the area of a particular address on W Main Street in Waterbury, Connecticut. Victim-1 was observed bleeding from his/her hands and left elbow. Victim-1 stated to officers that he/she had been robbed at gunpoint.

28.     Victim-1 explained that he/she owned an ATM business and was in the process of filling an ATM with cash located at the A1 convenience store on Willow Street in Waterbury, Connecticut, when he/she was attacked in the parking lot of the business. Victim-1 stated that a skinny black male wearing a black hoodie (UM1) approached him/her from behind, and wrapped his arm around his/her neck, holding a gun to his/her head. Victim-1 explained that a physical altercation with UM1 ensued. Victim-1 was thrown to the ground as he/she attempted to take control of the firearm. At some point during the altercation, the firearm was discharged by UM1. Victim-1 was then able to obtain control of the firearm. No one was reported to have been struck by the gunfire.

29.     Victim-1 stated that UM1 managed to grab a box in the back seat of Victim-1's vehicle that contained approximately $35,000 in U.S. currency. UM1 was then said to have fled on foot on Hillside Avenue.

30.     Victim-1 immediately fled the area in his/her vehicle and waited for police at the particular address on W Main Street in Waterbury, CT. Victim-1 had grabbed the firearm and brought it with him/her.

31.     Victim-1's significant other, who was present throughout the incident, had been seated in the front passenger seat of Victim-1's vehicle during the robbery. Victim-1's significant other recounted similar details of the robbery event, adding that he/she did not believe UM1 had seen him/her, as he/she was hiding in the front seat.

32.     WPD officers recovered a black Smith & Wesson M&P Shield M2.0, 9mm, serial number JMV5206 from Victim-1's vehicle. A magazine was not found within the firearm. WPD officers responded to the area of the A1 convenience store to search for evidence of the robbery. Officers were unable to recover any spent cartridge casings, firearm magazines, or additional

witnesses of the robbery at the scene. When WPD later attempted to clear the firearm of any ammunition still possibly remaining in the firearm, a spent 9mm cartridge casing was ejected.

**E. NIBIN Analysis and Other Information**

33.     On August 29, 2022, the recovered firearm was test fired by a Waterbury Crime Scene Technician, with the spent cartridge casing being entered into NIBIN under WPD case #22-82498. The NIBIN entry from the recovered firearm test fire resulted in two (2) NIBIN "Leads," a preliminary correlation between the recovered firearm and the shooting incidents on August 14 and August 15, 2022, described above. Given that the same firearm is believed to have been used at the three (3) separate incidents, within a short timeframe of nine (9) days, and that the same vehicle, the white Toyota Corolla bearing misused registration AX92214, was believed to have been involved in at least two of the incidents, it is likely that the same individual and/or group of individuals may have participated in the incidents.

34.     It should be noted that the above listed firearm was swabbed for trace DNA by WPD and submitted to the Connecticut Forensics Science Laboratory for analysis on August 24, 2022, in an attempt to identify the robbery suspect, UM1. At the time this affidavit was submitted, the analysis of the potential DNA evidence had not yet been completed by the laboratory.  According to NIBIN, there is a preliminary correlation between the cartridge casings recovered at each of the above-described shooting incidents and robbery. Thus, law enforcement believes that the three (3) incidents detailed above involve the same 9mm caliber firearm. Based on the NIBIN results, it is believed that the same individual and/or associated group of individuals may have participated in each of the shooting incidents or that the firearm is shared amongst a group of co-conspirators.

35.     Like utilizing NIBIN to determine if there is a pattern in the weapon(s) used in the shooting incidents, identifying a pattern in the cellular devices present at the shootings is exceedingly useful. Thus, there is probable cause to believe that the requested information will lead to evidence of a crime, specifically by identifying individual(s) who are present at all or several of the three incidents. The requested authorization would also provide law enforcement with the cellular numbers utilizing the specific cellular towers in a particular area at a particular time (and would not provide any identifying information such as personal identification data or even names), and thus, identifying the phone numbers in common amongst the incidents will allow law enforcement to gather further information, such as sending subpoenas to identify the account holders of such phone numbers.

36.     From my training and experience, I have learned that individuals typically always carry their cellular phones on their person so that they can communicate with others.

37.     I know from my training and experience that persons contemplating criminal actions, including robberies, assaults and shootings, often use their cellphones around the time of their criminal actions to (1) ascertain where the target location is and/or (2) to coordinate with co-conspirators. It is this affiant's belief, based on my training and experience, that incidents such as these often involve a third party that acts as a "look out" and/or "get away" driver. Quite often these individuals communicate via cell phone call and/or text message prior to and at the conclusion of the criminal act.

38.     This is particularly true with individuals who operate as part of an organization, group or gang that commits violent acts. I have learned during my investigations that these individuals will often communicate with others to alert them of their "score," when they have shot at and/or injured others.

39.     Further, individuals will use cellular devices to contact other conspirators to obtain assistance, for example, if they are injured; if they are being pursued by law enforcement or their rivals, or if they need a location to hide after they commit their violent crime.

40.     I also know, based on my training and experience, that individuals often use social media platforms to describe and/or discuss their shooting activities and that they utilize their cellular phones to make such communications. I also believe that individuals will also leave the area after an incident and use their cellular phones to communicate a meet up location with other conspirators to discuss what they have just done.

41.     Based on my training and experience, as well as the details provided of the three incidents and the connections between those incidents, it is very likely that the shootings involved multiple perpetrators and/or co-conspirators, and that these individuals would have used cellular telephones to communicate with each other. Additionally, given the urban location of the shooting sites, it is my belief that anyone traveling near or through multiple shootings locations during the time parameters could be perpetrators. As a result, I believe that the identities of the perpetrators may be located within the possession of cellular providers.

42.     From my training and experience, I also know that cellular service providers track and collect all incoming data using cell towers even though the user of the device is not actively using the device. For data to not be collected, the user would have to make an affirmative action to either turn the phone off or place the phone in airplane mode to stop or prevent any data being collected by the cell towers. I also know through training and experience that suspects are likely to have cellular phones on their person or near their person.

43.     It is also this affiant's belief that the shooting incidents listed above are likely part of greater criminal activity, currently known and unknown to law enforcement, which increases the likelihood that the requested authorization will lead to valuable information.

44.     In this investigation, witness accounts have shown more than one individual being involved in at least two of the shooting incidents detailed above.  It is likely that there are even more individuals, currently unknown, that have been in communication with the unknown suspect(s) regarding the criminal activities. From my training and experience, I know that suspects often communicate with their criminal associates before and after shootings via cellular device to brag or discuss what had just occurred.  Particularly with the armed robbery that took place on August 23, 2022, the suspect(s) would have likely communicated with others to brag about the large amount of money taken from Victim-1and/or discuss the firearm being discharged and lost.

45.     It is likely that the two (2) individuals described in at least two of the shooting incidents are part of a larger group of criminal associates, whether gang affiliated or not. Individuals will communicate what they have done, seen, plan to do, etc., with their associates through cellular phones via various apps, text messages or phone calls to relay the message.

46.     For all these reasons, I believe that it is exceedingly likely that the preparator(s) in each incident were carrying a cellular device with them, either in a car or on their person. It is this affiant's belief that the requested information would greatly assist law enforcement in identifying the potential suspects involved in each of these incidents. Most importantly, by comparing the cell tower information in the areas of the three shootings at the time each event occurred, I believe law enforcement will be able to identify common cellular numbers, indicating that the particular cell phone holders may have been involved in the shooting(s). Accordingly, I

believe that if the requested authorization is granted, it will lead to evidence of a crime by highlighting those devices that were in the area of multiple shootings.

47.     In the instant matter, I further believe that the requested authorization is sufficiently narrowed to mitigate the risk of gathering information that is not evidence of a crime.

a.   The information sought for the date of each shooting is limited to a ten-minute timeframe during which a shooting occurred, and thus the location data is tailored and specific in terms of time.

b.   The information sought is limited in terms of location. The information sought pertains to historic cell tower information at specific locations at which a shooting occurred. Thus, locations have been narrowly crafted to ensure that location data, with a fair probability, will capture evidence of the crime only.

c.   The information sought is also limited in terms of the nature of the information obtained. If the requested authorization is granted, law enforcement will obtain useful but not detailed information i.e. the cellular telephone numbers assigned to phones in that area that utilized the specific cellular tower during the specific time frame. More personal information, such as user addresses, account holder information, or other identifying information will not be obtained by the requested warrants, but rather would have to be obtained separately by law enforcement after further analysis and narrowing of the cellular tower data. Given the limited nature of the information to be obtained, the potential to capture even limited

information about individuals not connected to the crime is significantly

mitigated.

48.      Based on the above facts, there is probable cause to believe that the

records described in Attachments A and B would identify the wireless device(s) that were in the

vicinity of a particular address on N Main Street, Waterbury, Connecticut, on August 14, 2022 at

approximately 19:35 EST (shooting incident number one); a particular address on Hillside

Avenue, Waterbury, Connecticut, on August 15, 2022 at approximately 11:52 EST (shooting

incident number two) and a particular address on Willow Street, Waterbury, Connecticut, on

August 23, 2022 at approximately 15:14 EST (shooting incident number three).

## CELL TOWER INFORMATION

49.      Many cellular service providers maintain antenna towers (cell towers) that serve

specific geographic areas. Each cell tower receives signals from wireless devices, such as

cellular phones, in its general vicinity. These cell towers allow the wireless devices to transmit or

receive communications, such as phone calls, text messages, and other data. The tower closest to

a wireless device does not necessarily serve every call made to or from that device.

50.      Cell-site location information (also known as "tower/face information" or "cell

tower/sector records") identifies the antenna tower that a cell phone utilized to engage in a

particular call or other transaction and provides the location of that tower. In many cases, a single

tower will have numerous antennas ("sectors"), each of which provides service to a particular

portion of the tower's coverage area. For example, assuming that a tower provides coverage to a

circular area around it, the tower may be divided into three sectors, each of which has an antenna

that provides service to roughly 120 degrees of the circle. In these cases, the cell site location

information also will typically identify the sector of the tower that handled the communication as well as the direction in which the antenna for that sector faces.

51.     The information regarding the tower (and sector) used by a cell phone or wireless device will reveal the general location in which the phone was located at the time that a particular communication occurred. Furthermore, the precision of cell-site location information varies depending on factors including the distance between towers. In a dense urban area, towers may be a half-mile or more apart; in more rural areas, towers may be 10 miles or more apart. Thus, while the location information will be more precise the closer together towers are located, it will still only identify a general area in which the phone was located, rather than giving specific coordinates.

52.     Cell-site location information is not continuous. It is generated only when the phone is used to engage in communications, and while all providers provide cell-site location information for calls, the production of information relating to other communications such as texts and Internet can be less consistent.

53.     Cellular service providers routinely maintain historical cell-tower log information, including records identifying the wireless telephone calls and communications that used a tower. For each communication, these records may include:

> a.   The telephone call number and unique identifiers[4] for the wireless device in the vicinity of the tower that made or received the communication ("the locally served wireless device");

---

[4] Depending on the cellular network and the device, the unique identifiers for a cell phone could include an Electronic Serial Number (ESN), a Mobile Electronic Identity Number (MEIN), a Mobile Identification Number (MIN), a Subscriber Identity Module (SIM), a Mobile Subscriber Integrated Services Digital Network Number (MSISDN), an International Mobile Subscriber Identifier (IMSI), or an International Mobile Equipment Identity (IMEI).

b. The source and destination telephone numbers associated with the communication (including the number of the telephone that called or was called by the locally served wireless device);

c. The date, time, and duration of the communication;

d. The "sectors" (i.e., the faces of the towers) that received a radio signal from the locally served device; and the type of communication transmitted through the tower (such as phone call or text message);

e. Such information <u>does not</u> include identifying information beyond the telephone number such as home addresses, dates of birth, or even names.

54.    A tower dump is a form of historical cell-site data that reveals all the cellular phones that utilized a tower (e.g. the tower that serviced a crime scene) at a given point in time. Because hundreds of phones can contact a tower even in a short time frame, a tower dump from a single tower at a single point of time is not likely to be particularly helpful. Rather, this type of information is typically most helpful when you can cross-reference tower dumps from multiple towers and/or timeframes in order to identify phones of potential interest by virtue of the fact that they appear on each of the tower dump lists that correspond to a particular event and/or location.

## AUTHORIZATION REQUEST

55.    Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

56.    I further request that the Court direct the Service Providers to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the search warrants will be served on the Service Providers, who

will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

57.     I further request that the Order require the Service Providers not to notify any person, including individuals whose wireless devices connected to the cellular telephone towers described in Part I of Attachment A, of the existence of the Order until further order of the Court. *See* 18 U.S.C. § 2705(b). Such a requirement is justified because the Order relates to an ongoing criminal investigation, and its disclosure may alert the targets to the investigation. Accordingly, there is reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, or notify co-conspirators. *See* 18 U.S.C. § 2705(b)(2), (3), (5). Some of the evidence in this investigation may also be stored electronically. If alerted to the investigation, the subjects under investigation could destroy that evidence, including information saved to their electronic devices.

Respectfully submitted,

NATHANIEL MAY
Digitally signed by
NATHANIEL MAY
Date: 2022.09.19
08:57:07 -04'00'

Nathaniel May, ATF SA

Subscribed and sworn to me by telephone or other reliable means on this 19th day of September 2022.

ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**I.      The Cell Towers**

The cellular towers providing cellular service to the following locations on the following dates and times:

| Cell Towers | Date | Times |
|---|---|---|
| The cell towers that provided Cellular service to ▮▮▮▮ ▮▮▮ Waterbury, CT 06704 | August 14, 2022 | 1930 to 1940 hours EST |
| The cell towers that provided Cellular service to ▮▮▮▮ ▮▮▮ Waterbury, CT 06710 | August 15, 2022 | 1147 to 1157 hours EST |
| The cell towers that provided Cellular service to ▮▮▮▮ ▮▮▮ Waterbury, CT 06710 | August 23, 2022 | 1509 to 1519 hours EST |

The following cellular service provider(s) are required to disclose information to the United States pursuant to this warrant:

1. AT&T, a cellular service provider headquartered in Dallas, Texas;
2. T-Mobile, a cellular service provider headquartered in Bellevue, Washington; and
3. Verizon, a cellular service provider headquartered in New York, New York.

**ATTACHMENT B**

**I.   Records and Other Information to Be Disclosed**

For each cell tower described in Attachment A, the Service Provider named in the Search Warrant is required to disclose to the United States all records and other information (not including the contents of communications) about all communications made using the cell tower during the corresponding timeframe(s) listed in Attachment A, including the records that identify:

A.   the telephone call number and unique identifiers for each wireless device in the vicinity of the tower ("the locally served wireless device") that registered with the tower, including Electronic Serial Numbers (ESN), Mobile Electronic Identity Numbers (MEIN), Mobile Identification Numbers (MIN), Subscriber Identity Modules (SIM), Mobile Subscriber Integrated Services Digital Network Numbers (MSISDN), International Mobile Subscriber Identifiers (IMSI), and International Mobile Equipment Identities (IMEI);

B.   the source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that called, or was called by, the locally served wireless device);

C.   the date, time, and duration of each communication;

D.   the "sectors" (i.e.,  the faces of the towers) that received a radio signal from each locally served wireless device; and

E.   The type of communication transmitted through the tower (such as phone call or text message).

**ATTACHMENT B (Continued)**

F.    These records should include records about communications that were initiated before or terminated after the specified time period, if part of the communication occurred during the relevant time period identified in Attachment A.

## II.  Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 18 U.S.C. Sections 924(c) and 1951 during the period August 14, 2022, and August 23, 2022, as detailed in Attachment A.  Such information does not include the contents of any communications.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in these Warrants.